IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No.   2:23-cr-71 |
| vs. | : | JUDGE MARBLEY |
| RAYMOND SMALL | : | |
| Defendant. | : | |

**RAYMOND SMALL'S SENTENCING MEMORANDUM**

I.     **INTRODUCTION.**

On September 1, 2023, Raymond Small ("Mr. Small" and "Ray", alternatively) entered a plea of guilty to Count One and Five of an Indictment filed against him in the Southern District of Ohio. Count One of the Indictment charged him with Possession of a Machine Gun per 18 U.S.C. §§ 922(o)(1), 924(a)(2), and 2. Count Five of the Indictment charged Mr. Small with Felon in Possession of a Firearm per 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The Court is tasked with imposing "a sentence sufficient, but not greater than necessary," to vindicate Congress' sentencing mandate, set forth in 18 U.S.C. § 3553(a)(2). The Court must begin sentencing proceedings by first correctly calculating the applicable guideline range. *Gall v. United States*, 128 S. Ct. 586, 596 (2007). However, this guideline range is only "the starting point and the initial benchmark." The Court "may not presume that the guideline range is reasonable." *Id.* at 596-97. A sentencing court is "free to make its own reasonable application of the 18 U.S.C. § 3553(a) factors, and to reject (after due

1

consideration) the advice of the guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). "[E]xtraordinary circumstances [are not required] to justify a sentence outside of the guidelines range." *Gall* at 595.

**II .    SENTENCING FRAMEWORK**

Per the calculation by the U.S. Probation Office, Mr. Small's total adjusted offense level is 30 and his Criminal History Category is V. The guideline provision under this criteria is 151-188 months. There are a number of objections Mr. Small has filed with regard to the sentencing calculations (see attached). If the Court were to agree with this analysis, Mr. Small's adjusted guideline range stands at 100-125 months.

Even this adjusted range calls for a sentence not commiserate with the ultimate nature of this case. Mr. Small asks this Court to sentence him to a term of **60-72 months**. The requested sentence would reflect the seriousness of the offense; provide just punishment; provide adequate deterrence; and protect the public from further crimes committed by him. 18 U.S.C. § 3553(a)(2).

### III. SENTENCING FACTORS—18 U.S.C. § 3553(a).

The final step of the sentencing analysis requires this Court to determine what sentence is sufficient, but not greater than necessary, to satisfy Congress' sentencing mandate. Mr. Small points to the following three § 3553(a) factors to answer this statutory question: (1) Small's history and characteristics; (2) the nature and circumstances of the offense and (3) the need for the sentence to reflect just punishment. In the end, Mr. Small submits that his requested sentence would vindicate Congress' sentencing mandate as it would not diminish the seriousness of his offense, and would provide just punishment, adequate deterrence and protection of the public.

#### a. MR. SMALL'S HISTORY AND CHARACTERISTICS—§ 3553(a)(1).

*"When people have their whole lives focused on being number one and getting to the pinnacle – and the NFL is the pinnacle – the loss of identity can be very crushing for any player,"*

– Mike Singletary, former Chicago Bear and NFL Hall of Fame linebacker



Ray Small is no longer a football player, hasn't been for a few years now. It's hard, though, to live with that realization when for so long, your sense of identity and self-worth is tied up to this image. Even harder is being a former athlete who never reached

the career expectations that nearly everyone around you has for you. That, in and of itself, is bad enough. For Ray, though, worst of all is the further stigma of being labelled the stereotypical "troubled former athlete" dating back to his days at Ohio State. After various run-ins with the law, perhaps he has earned that label. Certainly, people were quick to put it on him. A short search of Ray's name on Google would confirm as much.

While it's important for us to examine how football played such a large role in defining who Ray was, these simple labels do not do him justice as a human being. In order to understand how Ray got to this point, and what Ray will do to finally move beyond this identity as the troubled former athlete, we must dig deeper.

Ray, along with his brother and sister, were raised in Cleveland by his parents, Kenneth and Veda. Kenneth was a notorious drug dealer who spent much of Ray's youth in federal and state prison. Even when Kenneth got out of prison, he remained a lifelong drug addict. Meanwhile, Veda did her best to support the kids, but she had her own struggles with pills and alcohol. Moving from place to place, Ray's family lived in the toughest neighborhoods in Cleveland. As a teenager, Ray started running the streets and fell dangerously close to following in his father's footsteps. It was at that time that football found him.

Ray attributes his high school coach, Ted Ginn Sr[1]., with effectively saving his life around that time. Coach Ginn took in Ray at that crucial time in his life when things could

---

[1] Coach Ginn is expected to appear and speak briefly on behalf of Ray at his sentencing hearing on 4/5

4

have really gone off the rails. It's not just that Coach Ginn gave Ray an opportunity to hone his athletic talent in a safe space at the legendary Glenville High School in Cleveland, but he also instilled discipline and routine in the young man. Coach Ginn did his best to shield the highly impressionable Ray from negative influences, which included Kenneth. Coach Ginn felt that Kenneth was actively attempting to interfere in his efforts to help Ray out of fear and jealousy. Further, he believed that as Ray's talent and future prospects became more self-evident, Kenneth grew insecure of Ray's potential to outdo and surpass him. Nevertheless, much as he did for his own son, Ted Ginn Jr., Coach Ginn was able to nurture Ray's talent into a football scholarship at the Ohio State University, making Ray the first in his family to attend college.

At Ohio State, life became different for Ray. Coach Ginn no longer was a constant presence in Ray's life, though he did room with Ted Jr his freshman year at the request of Coach. Being away from Cleveland, though, Ray should have been able to escape the negative influence of his father. Sadly, this was not the case as Kenneth and Vera moved to Columbus to remain close to their perceived golden goose. As the stress of having to accommodate his parents as well as adjusting to the demanding life of a student-athlete got to him, Ray slid back into old bad habits. Even though his alcohol and marijuana usage became problematic, it did not prevent him from continuing to play football. As this Court is aware, Ray had a college football career marked with stunning highlight-

reel flashes of next level talent but also one checkered with its share of controversy.[2] Ray ultimately left Ohio State without a degree in hand. That being said, Ray was not necessarily encouraged to take classes that were designed to give him career building skills and knowledge. Rather, he was encouraged to take courses that would ensure he would remain academically eligible. Upon reflection, Ray wishes he had taken a course load conducive to a future life outside of football.

What Ray still had though was a dream to lift himself and his family out of their circumstances with an NFL contract. While he wasn't drafted by any teams, he was able to land on several practice squads over the next year. Even the relatively modest (per NFL standards) salary Ray received from being on those practice squads was more money than he had ever seen in his life. In his mind, he was well on his way to living his dream.

Still, Ray was living hand to mouth as people all around him had their own hands out, most notably Kenneth. Meanwhile, Ray had not let go of his bad habits, repeatedly failing random drug tests for the NFL. Ray was talented, but he wasn't talented enough for teams to put up with his seemingly constant issues. It was not long before Ray was completely out of the NFL.

This is when things got very hard for Ray. Psychologically, he was at his lowest, having seen his dreams of playing in the NFL die. He came back to Columbus to live with

---

[2] This includes the infamous 'Tatooogate' incident in which the 2010 team forfeited all of its wins and individual season records after several players, including Ray, sold some of their memorabilia to a tattoo parlor. Regardless of how significant those deeds appear in the light of modern NIL arrangements, Ray did it because he was destitute.

Kenneth and Veda and he compensated for his perceived failures by getting deeper into drugs. Kenneth gave Ray an education on how to start dealing drugs and it wasn't long before Ray found himself in prison for drug trafficking. Even after he was released from prison, Ray continued to struggle to find his way. He was deeply affected from discovering both Kenneth and Veda deceased nearly a year apart from drug overdoses. Their deaths just seemed to put a capper on what he believed to be the failure of his life up to that point. If Ray could not save his parents from themselves, what chance did he have for himself?

This is not to say it was all darkness for Ray though. His longtime partner, Que Air Daniels, had stood beside him through the highs and lows. She has firsthand knowledge of the influence Ray's parents had on him, the pressures he faced trying to succeed in professional sports, and the low of having gone to prison. She has stood by his side because she believes him to be something more than these rote descriptions of him. Que Air recognizes Ray as a man who cared for others to a fault, trying to give them what he thought they wanted rather than what they needed. She has spent years trying to show him what it means to love and be loved in a real way. Together, they had begun to pick up the pieces. They had two sons together, and Ray began being the real kind of father he never had. They started a small business doing commercial building cleaning. It was an honest life, but not one without financial struggle. Sadly, it was this same ill-conceived desire to please and do right by his family that sent Ray down this path again.

Understanding that this is how Ray got here, how does Ray move forward to close out this chapter? Per the forensic evaluation performed by Dr. Veltri[3], there are a number of real interventions that the BOP and this Court can employ to deal with some of these root causes. For instance, Ray could use some real help dealing with the trauma he has developed over his lifetime. These traumas start with his experiences from childhood and extend to things he witnessed and experienced in prison. Additionally, Ray is in dire need of Cognitive Behavioral Therapy to help him adjust a decision-making process that has been distorted for years. Finally, Ray needs significant substance abuse counselling to address his past choices of numbing his pain with alcohol, marijuana, and pills. In short, Ray needs the help of professionals he can trust to turn the page and forever close this chapter of his life.

### b. NATURE AND CIRCUMSTANCES OF THE OFFENSE; — §§ 3553(a)(1).

The offense for which Ray stands convicted is unquestionably serious. As this Court has noted in the past, there currently is a gun pandemic that has seems to have swept over society, and it's understood that Ray's actions only had the potential to further fuel that pandemic.

Ray asks, however, that his behavior be viewed in context of the previously discussed background information and the circumstances of the allegations. For his part,

---

[3] The report from Dr. Veltri will be filed separately in a sealed supplement.

8

Ray is not only remorseful for the effect his arrest and conviction have had on his family, but he is also reflective of the larger societal issues of gun violence.

It should be noted that Ray was not regularly selling pills or firearms when he initially got involved in the actions leading to this case. It is true that based on his past connections from both his father and his own past criminal actions, Ray knew the people and places that he could turn to in order to try to secure contraband. Ray and QueAir were trying to get their cleaning business off the ground, and it was a constant struggle to keep up with the family expenses. So when this opportunity came Ray's way to try to raise some extra money, he took it. Ray was effectively the middle man for his codefendant, Maylon Lamison's sale of the machine gun that establishes Count One. The rest of the sales were a bit of piecemeal type of transactional business. Ray, having found someone wanting to purchase firearms, would then go seek out firearms to sell to what turned out to be undercover agents. He was certainly not selling firearms to anyone else during these months, nor was he generating large quantities of money from these sales. While this does not diminish Ray's culpability, it does provide context for his mindset during this time.

**A SENTENCE OF 60-72 MONTHS PROVIDES JUST PUNISHMENT AND DOES NOT DIMINISH THE SERIOUSNESS OF MR. SMALL'S OFFENSE AND PROVIDES ADEQUATE DETERRENCE AND PROTECTION OF THE PUBLIC—§§ 3553(a)(2)(A)-(C).**

Ray finds himself at a proverbial crossroad. He has reached an age where he must decide for himself how he will be defined: will he forever destined to be the troubled former athlete, or will he change the narrative in a positive way? He has begun to do the hard work necessary to do the latter. Ray currently enjoys the support of his family, but he recognizes that this support will be fleeting if he is not willing to make necessary changes in his life.

A sentence greater than that requested is not necessary to deter Ray from committing similar offenses. Data shows that long prison sentences do little to deter people from committing future crimes. Dep't. of Justice, Office of Justice Programs, Nat'l Institute of Justice, *Five Things About Deterrence* (available at http://nij.gov/five-things/pages/deterrence.aspx). Viewing the findings of research on severity effects in their totality, there is evidence suggesting that short sentences may be a deterrent. However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect. *Id.* In fact, lengthy prison sentences may exacerbate recidivism. *Id.* "Decisions to refrain from crime are based on the mere knowledge that the behavior is legally prohibited or for other nonlegal considerations such as morality or

fear of social sanctions."[4] In addition, "certainty of apprehension and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent."[5]

The requested 60-72 months will have an adequate deterrent effect both on Ray and upon on others who might engage in similar conduct. To be an effective deterrent, the sentence must not only educate defendants as to the seriousness of the offense, but should make others in the community "aware that similar actions will be punished." *United States v. Coleman*, 370 F. Supp. 2d 661, 681 (S.D. Ohio 2005), rev'd on other grounds, *United States v. White*, 551 F.3d 381 (6th Cir. Ky. 2008). In this matter, the sentence that Ray seeks will be the longest period of incarceration he has ever served. Ray will spend that time constructively working towards a crime-free future.

A sentence of 60-72 months for this offense would serve as a significant deterrent for others who might think to engage in such behavior. As noted above, this lengthy period of incarceration shows that the illegal sale of firearms will be treated severely. What Ray needs now is assistance with the myriad of mental health and substance abuse issues which plague him today. He has been having the tough conversations with Que Air and the other people important in his life. As noted above, Ray has woken up to the idea that this might be his last opportunity to change the narrative of his life. With the support of his family and his own self-determination, he knows he can more than

---

[4] S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 204 (2013). And even for those "for whom sanction threats might affect their behavior, it is preposterous to assume that their perceptions conform to the realities of the legally available sanction options and their administration." *Id.*
[5] *Id.* at 200-201.

"troubled former athlete, Ray Small". Rather, he can be "former troubled athlete, Ray Small" or just Ray.

**IV. CONCLUSION.**

In light of his history and characteristics, the nature and circumstances of this offense, his role within the offense, and the sentencing range established for this offense, Raymond Small respectfully requests a sentence of 60-72 months incarceration concurrent to the state sentence he is currently serving. Mr. Small submits that the requested sentence is sufficient, but not greater than necessary, to punish him for his offense, deter others, and to protect the public.

Respectfully submitted,

JOSEPH MEDICI
FEDERAL PUBLIC DEFENDER

/s/ Soumyajit Dutta
Soumyajit Dutta (OH 76762)
Assistant Federal Public Defender
Office of the Federal Public Defender
10 West Broad Street, Suite 1020
Columbus, Ohio 43215-3469
Telephone: (614) 469-2999
Facsimile: (614) 469-5999
Soumyajit_Dutta@fd.org

*Attorney for Defendant*
*Raymond Small*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record on the date of filing.

    /s/ Soumyajit Dutta
Soumyajit Dutta (OH 76762)
Soumyajit_Dutta@fd.org